**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois,<br><br>          Plaintiff,<br><br>v.<br><br>3M COMPANY, DYNEON, L.L.C., ARKEMA, INC., AGC CHEMICALS AMERICAS INC., BASF CORPORATION, BAYER CORPORATION, CLARIANT CORPORATION, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, CORTEVA, INC., DOWDUPONT, INC., DUPONT DE NEMOURS, INC., E. I. DU PONT DE NEMOURS AND COMPANY, DAIKIN AMERICA, INC., and SOLVAY SPECIALTY POLYMERS, USA, LLC,<br><br>          Defendants. | **CASE NO. 23-cv-1341**<br><br>**NOTICE OF REMOVAL** |

       Defendant 3M Company ("3M"), by undersigned counsel, hereby gives notice of removal of this action, pursuant to 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446, from the State of Illinois Circuit Court of Cook County, to the United States District Court for the Northern District of Illinois, Eastern Division. 3M is entitled to remove this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). In addition, 3M is entitled to remove this action based on federal enclave jurisdiction. As grounds for removal, 3M states as follows.

**<u>PRELIMINARY STATEMENT</u>**

       1.     The State of Illinois ("State") has brought this action seeking to hold 3M and fourteen other Defendants liable for their alleged conduct in manufacturing and selling per- and

polyfluoroalkyl substances ("PFAS")—including perfluorooctane sulfonate ("PFOS") and perfluoro-octanoic acid ("PFOA")—and PFAS-containing products, which purportedly have resulted in alleged contamination of the State's environment and natural resources. *See* Complaint (attached as Exhibit 1) at pp. 1-2; *see generally, e.g.*, *id.* ¶¶ 122-352.

2.    The State seeks, *inter alia*, to recover for "all past and future natural resource damages" caused by Defendants' PFAS and PFAS-containing products, *e.g.*, *id.* at p. 61, including damages to the State's groundwater and surface waters, *id.* ¶¶ 314-331. That includes alleged damages with respect to seventy community water supplies ("CWS") that the State has identified as "PFAS Sites" based on "detected levels of PFAS that were greater than or equal to Illinois' Health Advisory Levels." *Id.* ¶ 252. Those "PFAS Sites" include but are not limited to the Evanston, Glencoe, Winnetka, Wilmette, Hawthorn Estates, Antioch, and Fox Lake CWS's. *See id.* ¶¶ 253-313. The State also seeks to recover the costs of its "statewide investigation into the prevalence and occurrence of PFAS . . . across Illinois." *Id.* ¶ 249; *see, e.g. id.* at pp. 1, 88.

3.    But the alleged PFAS contamination in Illinois, including the alleged contamination from PFOS and PFOA, likely resulted in part from the use, storage, and/or disposal of PFAS-containing aqueous film-forming foams ("AFFF") that 3M (and others) developed and sold to the U.S. military in accordance with rigorous military specifications ("MilSpec"). AFFF is a highly effective firefighting foam for extinguishing fuel-based fires. The use of MilSpec AFFF at U.S. military facilities and elsewhere across Illinois, including during firefighting training and response activities, plausibly contributed to the alleged harm to the State's environment and natural resources from PFAS. Use of MilSpec AFFF plausibly contributed to the alleged harm at one or more of the seventy PFAS Sites identified by the State—in fact, one of those PFAS Sites (the Rock Island Arsenal CWS) is at a U.S. military facility and is operated by the U.S. military. And

numerous other of the PFAS Sites identified by the State are in the vicinity of U.S. military facilities where (according to the federal government) PFAS detections are known or suspected to have occurred based on historical AFFF use there.[1] For example, use of MilSpec AFFF plausibly contributed to the alleged harm in Evanston, Glencoe, Wilmette, and Winnetka because the water supply for those communities is drawn from Lake Michigan, and AFFF releases at nearby U.S. military facilities (including the Great Lakes Naval Station) plausibly contributed to the PFAS in Lake Michigan. In fact, the City of Evanston and Village of Fox Lake have both filed separate federal lawsuits against 3M that are pending in the *In re AFFF Products Liability Litigation* multidistrict litigation ("*In re AFFF* MDL"), seeking damage for alleged PFAS contamination of their water supplies resulting from use of AFFF. In addition, because the State seeks recovery for all of its costs associated with its investigation into potential PFAS contamination throughout Illinois, its claims necessarily encompass claims plausibly related to the use of MilSpec AFFF at military facilities and other locations within Illinois. In fact, the State's own website identifies AFFF releases at military installations as a source of alleged PFAS contamination,[2] and the State's press releases regarding its PFAS investigation similarly have identified AFFF as a source of PFAS.[3]

     4.    To the extent that the State's alleged damages arise from MilSpec AFFF, 3M intends to assert the federal government contractor defense in this action. Although the Complaint

---

[1] *See* Illinois EPA, *PFAS Statewide Investigation Network: Community Water Supply Sampling*, https://www2.illinois.gov/epa/topics/water-quality/pfas/Pages/pfas-statewide-investigation-network.aspx (including Interactive Dashboard and Map showing seventy "PFAS Sites").

[2] Illinois Environmental Protection Agency ("Illinois EPA"), *Per- and Polyfluoroalkyl Substances (PFAS)*, https://www2.illinois.gov/epa/topics/water-quality/pfas/Pages/default.aspx.

[3] Press Release, Illinois.gov, *Illinois EPA to Begin Testing all Illinois Community Water Supplies for Per- and Polyfluoroalkyl Substances*, Sept. 14, 2020, https://www.illinois.gov/news/press-release.22078.html.

purports to allege that "PFAS, as defined in this Complaint, do _not_ include any PFAS that have contaminated Illinois' environment or natural resources from aqueous film-forming foams ('AFFF')," Complaint ¶ 17, the State's requests for relief nevertheless encompass damages from PFAS-containing AFFF. And in any case, the State's putative definition of PFAS to exclude PFAS from AFFF cannot prevent 3M "from raising the production of MilSpec AFFF as a defense or an alternate theory" of the State's alleged damages. *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021).

5.     Under the federal officer removal statute, 3M is entitled to remove this action to have its federal defense adjudicated in a federal forum. Courts have held that AFFF manufacturers properly removed cases (including other state attorney-general cases) to federal court on the ground that the plaintiffs' claims arose at least in part from MilSpec AFFF. *See Nessel*, 2021 WL 744683, at *4 (denying State of Michigan's remand motion); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.* ("*In re AFFF*"), No. 2:18-mn-2873, 2019 WL 2807266, at *2 (D.S.C. May 24, 2019) (denying State of New York's remand motion). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008); *see Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (federal officer removal "covers situations . . . where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete").

## THE STATE'S COMPLAINT

6.     The State filed this action on January 31, 2023, in the State of Illinois Circuit Court of Cook County. *See* Ex. A, Complaint. The action was assigned Case No. 2023L000996. 3M has not yet been served with the Summons or Complaint.

7.    The Complaint pleads that the State has brought this action as *parens patriae* to hold Defendants (including 3M) liable and to "recover natural resource damages and other monetary damages necessary for Illinois to continue identifying, monitoring, and remediating, where appropriate, contamination to Illinois' environment and natural resources" from PFAS. Complaint at p. 1; *see also id.* ¶ 37.

8.    The State generally alleges that Defendants (including 3M) have "designed, marketed, developed, distributed, sold, manufactured, released, supplied, transported, arranged for disposal or treatment of, handled, and/or used PFAS and/or PFAS-containing products in Illinois such that PFAS and PFAS-containing products have contaminated and threatened the State's natural resources and property." *Id.* ¶ 114. The Complaint further alleges that PFAS migrate in the environment, *id.* ¶ 131, and have caused contamination of the State's groundwater, surface waters, wetlands, and wildlife, *id.* ¶¶ 314-45, including the "Mississippi River System," *id.* at p. 83.

9.    The Complaint also alleges that from 2020 to 2021, the State conducted a "statewide investigation into the prevalence and occurrence of PFAS, including PFOS and PFOA in finished water at 1,428 entry points to the distribution system representing 1,749 community water supplies ('CWSs') across Illinois." *Id.* ¶ 15; *see also id.* ¶ 249. The Complaint states that "[o]f the 1,428 entry points sampled, Illinois EPA detected levels of PFAS that were greater than or equal to Illinois' Health Advisory Levels at 70 entry points." *Id.* ¶ 252. The Complaint refers to "[t]hose entry points with elevated levels of PFAS" "as 'PFAS Sites.'" *Id.*

10.    According to the Complaint, "[s]ome of the PFAS Sites include" the Evanston CWS, Glencoe CWS, Winnetka CWS, Wilmette CWS, Hawthorn Estates CWS, Antioch CWS, and Fox Lake CWS. *Id.* ¶¶ 253-313. The State does not limit its claims to these seven PFAS Sites. Further, the State expressly alleges that its list of PFAS Sites is "not exhaustive," that "[o]ngoing

and additional testing will almost certainly reveal further PFAS contamination and injury to Illinois' environment and natural resources around the CWSs identified . . . and additional locations yet to be sampled," and that "[a]s Illinois' investigation continues, Illinois reserves the right to supplement the above list." *Id*. ¶ 313.

11.    The Complaint acknowledges that "certain natural resources in Illinois may be contaminated by PFAS from AFFF." *Id*. ¶ 18. But the State asserts (without any support) that "such contamination is separable from PFAS contamination caused by . . . non-AFFF sources." *Id*. The State also alleges that "PFAS as defined in this Complaint do *not* include any PFAS that have contaminated Illinois' environment or natural resources from aqueous film-forming foams ('AFFFs')," *id*. ¶ 17, and that, for each of the seven PFAS Sites specifically identified in the Complaint (*i.e.*, at the Evanston, Glencoe, Winnetka, Wilmette, Hawthorn Estates, Antioch, and Fox Lake CWS's), "[b]ased on [its] preliminary investigation, the People have . . . concluded that AFFF is not a suspected source of PFAS contamination detected" at those Sites. *Id*. ¶¶ 257, 264, 271, 278, 287, 297, 307.[4]

12.    Among other forms of relief, the State seeks compensatory damages and an order "holding Defendants jointly and severally liable for all past and future natural resource damages, loss-of-use damages, response activity costs, costs of investigation, costs of testing and monitoring, . . . costs of restoring natural resources contaminated by PFAS including groundwater, surface waters, soils, sediments, and other natural resources, where appropriate, costs of remediating PFAS contamination at and around the CWSs identified above and additional

---

[4] But as noted above and discussed below (*infra* ¶¶ 49-50), notwithstanding the State's conclusory allegation, at least two of the municipalities referenced in the Complaint—Evanston and Fox Lake—have independently brought suit directly in the *In re AFFF* MDL, alleging contamination *from AFFF*, and another municipality in the vicinity (North Chicago) has done likewise.

locations yet to be determined, where appropriate . . . ." *E.g.*, *id*. at pp. 61, 64, 66, 70, 74; *see also id*. at pp. 88-89. The State further seeks for Defendants "to compensate the Illinois Department of Natural Resources for injury and damage to aquatic life, wildlife, habitat, and other natural resources lost or destroyed in the Mississippi River System at and around the CWSs identified above and additional locations yet to be determined." *Id*. at p. 83.

13.     Based on these allegations, the State asserts claims against Defendants (including 3M) for negligence, *id*. ¶¶ 353-58; trespass, *id*. ¶¶ 359-74; public nuisance, *id*. ¶¶ 375-81; strict products liability–failure to warn, *id*. ¶¶ 382-401; strict products liability–design defect, *id*. ¶¶ 402-21; civil conspiracy, *id*. ¶¶ 422-27; unjust enrichment, *id*. ¶¶ 428-39; restoration under the Illinois Fish and Aquatic Life Code and the Illinois Wildlife Code, *id*. ¶¶ 440-58; and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, *id*. ¶¶ 459-62.[5]

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL UNDER 28 U.S.C. §§ 1441 AND 1446 ARE MET

14.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 93(a)(1) and 1441(a) because the State of Illinois Circuit Court of Cook County is located within the Northern District of Illinois, Eastern Division.

15.     3M is not required to notify or obtain the consent of any other Defendant in this action to remove this action as a whole under 28 U.S.C. § 1442(a)(1). *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Ayotte v. Boeing Co.*, 316 F. Supp. 3d 1066, 1073 (N.D. Ill. 2018).

16.     Pursuant to 28 U.S.C. § 1446(a), 3M states that it has not been served with any process, pleadings, or orders in this action. This Notice of Removal is therefore timely filed under

---

[5] The Complaint also asserts claims against Defendants other than 3M for violations of the Illinois Uniform Fraudulent Transfer Act. Complaint ¶¶ 463-73.

28 U.S.C. § 1446(b).

17.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on all other parties to this case, and a copy is being filed with the Clerk of the State of Illinois Circuit Court of Cook County.

18.     By filing a Notice of Removal in this matter, 3M does not waive, and reserves, its right to assert any defenses and/or objections to which it may be entitled.

19.     3M reserves the right to amend or supplement this Notice of Removal.

20.     If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

21.     Removal here is proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that it is a "(1) 'person' (2) 'acting under' the United States, its agencies, or its officers (3) that has been sued 'for or relating to any act under color of such office,' and (4) has a colorable federal defense to the plaintiff's claim." *Ruppel*, 701 F.3d at 1180-1181 (quoting 28 U.S.C. § 1442(a)); *accord Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 133-35 (1989); *Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020); *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010).

22.     Removal rights under the federal officer removal statute, 28 U.S.C. § 1442, are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint;

8

the federal-question element is met if the defense depends on federal law." *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999). This is because the "basic purpose of § 1442(a)(1) is to ensure a federal forum for defenses of official immunity by federal officers." *Harris v. Rapid Am. Corp.*, 532 F. Supp. 2d 1001, 1004 (N.D. Ill. 2007). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, 28 U.S.C. § 1442 as a whole must be "liberally construed" in favor of removal. *Hammer v. U.S. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 527 (7th Cir. 2018) (quoting *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 147 (2007)).

23.     As set forth below, all requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal avers that the plaintiff's injuries were caused at least in part by use of MilSpec AFFF. *See, e.g.*, *Nessel*, 2021 WL 744683, at *4 (denying motion to remand in PFAS case against AFFF manufacturers because, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF, . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, 2018 WL 4781145, at *7-15 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in case against AFFF manufacturers). The Court overseeing the *In re AFFF* MDL has also held in similar cases, including multiple cases filed by the New York Attorney General, that removal under § 1442 was proper because the notice of removal averred that the alleged contamination derived in part from MilSpec AFFF. *See In re AFFF*, 2019 WL 2807266, at *2 (denying motion to remand brought by State of New York); Order 3-5, *In re AFFF*, No. 2:18-mn-2873, ECF No. 320 (D.S.C. Sept. 27, 2019) (denying second motion to remand brought by State of New York); *see also* Order 3-6, *In re AFFF*, No. 2:18-mn-2873, ECF No. 325 (D.S.C. Oct. 1, 2019) (denying New Jersey

water provider's motion to remand). Given its experience with the claims and defenses in AFFF litigation, the MDL Court's holdings show that removal to federal court is proper in this case.[6]

**A.    MilSpec AFFF**

24.    Since the late 1960s/early 1970s, the United States military began using AFFF that meets military specifications ("MilSpec AFFF") on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the U.S. Naval Research Laboratory developed AFFF (with some assistance from industry participants), and its researchers were granted the first AFFF patent in 1966.[7] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[8]

25.    The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command. The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[9] All MilSpec AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[10] Prior to such listing, "a manufacturer's . . . products are examined, tested, and approved to be in conformance with specification requirements."[11] The

---

[6] Following removal, 3M intends to designate this action for transfer to the *In re AFFF* MDL.

[7] U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[8] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[9] The 1969 MilSpec and all its revisions and amendments through the April 2020 amendment (MIL-PRF-24385F(4)) are available at https://tinyurl.com/yxwotjpg.

[10] MIL-PRF-24385F(4) § 3.1 (2020).

[11] Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements. After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[12] Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[13]

26.     From its inception until recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants"—the class of PFAS chemicals that includes PFOA and PFOS.[14] Even today, the AFFF MilSpec expressly contemplates the presence of PFOA and PFOS (subject to recently imposed limits) in AFFF formulations.[15] Indeed, the AFFF MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements."[16]

27.     3M manufactured and sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or more AFFF products manufactured by 3M were on the Navy's Qualified Products List for MilSpec AFFF from 1970

---

[12] Dep't of Defense SD-6, *supra* note 11, at 1.

[13] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[14] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

[15] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[16] *Id.* § 6.6.

until 2010 (even though 3M had phased out production of AFFF beginning in 2000).[17] The U.S. military used MilSpec AFFF acquired from 3M at military facilities throughout the United States, including in Illinois.

### B.    The Alleged Contamination Plausibly Derives In Part From MilSpec AFFF

28.    Upon information and belief, the PFAS chemicals that allegedly are contaminating the environment and natural resources of Illinois have derived in part from the use, storage, and/or disposal of MilSpec AFFF at military facilities and elsewhere across Illinois. Accordingly, the State's claims to recover for the alleged PFAS contamination—including the State's claims for natural resource damages related to the PFAS Sites and its claims to recover the costs of its statewide PFAS investigation—arise in part from MilSpec AFFF. Although the State's Complaint purports to exclude PFAS-containing AFFF from its definition of "PFAS," Complaint ¶ 17, the State's claims nonetheless encompass PFAS from MilSpec AFFF no less than PFAS from non-AFFF sources.[18] As the State alleges, PFAS are mobile in the environment. *See* Complaint ¶¶ 130-131. Upon information and belief, PFAS from MilSpec AFFF and PFAS from non-AFFF sources

---

[17] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014); MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (both available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

[18] Plaintiff cannot avoid that result by purporting to artificially *re-define* "PFAS" to exclude PFAS attributable to AFFF. *See* Complaint ¶ 17 ("PFAS as defined in this Complaint do *not* include any PFAS . . . from aqueous film-forming foams ('AFFFs')"). The utter artificiality of Plaintiff's purported definition is underscored by its own allegations elsewhere in the Complaint. For example, the preamble to the Complaint (at p. 1) acknowledges that "perfluoroalkyl and polyfluoroalkyl substances" are "a group of chemicals commonly referred to as PFAS," and the Complaint elsewhere cites the EPA's February 2019 PFAS Action Plan by its title "EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan." *Id.* ¶ 13 n.1. EPA does *not* define "PFAS" to exclude PFAS from AFFF, but has explained that "[w]hile the use of certain PFAS have been discontinued, legacy uses and a lack of commercially viable alternatives to certain public safety products (*e.g., fire fighting foams*) have resulted in PFAS contamination in certain areas." EPA PFAS Action Plan: Program Update 4 (Feb. 2020), https://www.epa.gov/sites/production/files/2020-01/documents/pfas_action_plan_feb2020.pdf (emphasis added).

are, in some locations, commingled in Illinois, and use of MilSpec AFFF at military facilities in Illinois plausibly contributed to the alleged contamination of the "PFAS Sites" identified in the Complaint. And as discussed below, one of those seventy PFAS Sites, Rock Island Arsenal CWS, is at a U.S. military facility that the U.S. Army has identified as a source of PFAS contamination from AFFF.

29.     There are a number of current and former military facilities that are located across the State of Illinois. The federal government has identified PFAS levels above regulatory guidance at some of those facilities, and it suspects that PFAS releases occurred at other facilities based on historical AFFF use there. According to the federal government, PFAS detections are "known" or "suspected" at thirteen military facilities in Illinois, and PFAS levels at and around those facilities are plausibly attributable at least in part to historical use of MilSpec AFFF.[19]

30.     The military facilities where (according to federal government data) PFAS detections are "known" or "suspected" include three active military bases in Illinois: the Scott Air Force Base in St. Clair, Illinois; the Rock Island Arsenal on Arsenal Island (near Rock Island, Illinois); and Great Lakes Naval Station in North Chicago, Illinois.[20] PFAS detections are also "known" or "suspected" at ten other current or former military facilities in Illinois, including the former Chanute Air Force Base in Champaign County, Illinois (where firefighter training for the

_____

[19] Data collected by the federal government on PFAS levels at federal military facilities is compiled in a spreadsheet available in the "PFAS Analytical Tools" section of the EPA's "ECHO" website at https://echo.epa.gov/trends/pfas-tools#resources. See the link for download of the "Federal Sites Data" PFAS dataset towards the bottom of the webpage. That data identifies thirteen current or former military facilities in Illinois as either "known" or "suspected" for PFAS detections. The PFAS Analytical Tools "data dictionary" indicates that PFAS detections are "known" if the "testing has occurred," and they are "suspected" if "activities associated with AFFF use occurred at location." Metadata for Data Sources within PFAS Analytical Tools at 24 (Jan. 2023), https://echo.epa.gov/system/files/PFAS_Analytic_Tools_Metadata_2022-12-28_508.pdf.

[20] See "Federal Sites Data" cited in note 19, supra.

Air Force used to occur); the former Savanna Army Depot on the Mississippi River in Carroll County, Illinois and Jo Daviess County, Illinois; the O'Hare Air Reserve Station formerly located at the O'Hare Airport; Naval Air Station Glenview formerly located in Glenview, Illinois; and Fort Sheridan formerly in/around Fort Sheridan, Illinois.

31.     Upon information and belief, MilSpec AFFF historically was or may have been used, stored, and/or disposed at each of those military facilities (and other current and former military facilities across Illinois), and MilSpec AFFF releases at those military facilities plausibly could have resulted in elevated PFAS levels at and around those facilities.

32.     Because the State seeks broadly to recover for (among other things) alleged natural resource damages from PFAS across the State and the costs of a statewide PFAS investigation, the State's claims encompass damages for alleged PFAS contamination that plausibly derives at least in part from MilSpec AFFF use at military facilities in Illinois. Upon information and belief, the alleged PFAS contamination of the State's groundwater, surface waters, soil, and wildlife, either in whole or in part, plausibly could have resulted from commingling of PFAS from MilSpec AFFF and PFAS from other AFFF and non-AFFF sources in Illinois. In addition, the costs of the State's PFAS investigation are attributable in part to the fact that MilSpec AFFF historically has been used and discharged at military facilities as well as elsewhere in Illinois.

33.     Upon information and belief, some of the seventy PFAS Sites referenced in the Complaint are in the vicinity of military facilities where PFAS detections are (according to the federal government) "known" or "suspected," and where such PFAS plausibly resulted from the historical use of MilSpec AFFF. A website for the Illinois EPA that is referenced in the State's

Complaint (*see* Complaint ¶ 15 n.2) identifies all seventy CWS's where the State's investigation has detected levels of PFAS that purportedly are greater than or equal to Illinois' guidance level.[21]

34.     In fact, one of the seventy PFAS Sites where the State claims to have identified elevated PFAS levels is the Rock Island Arsenal CWS, the water service provider owned and operated by the U.S. military for the Rock Island Arsenal. The Rock Island Arsenal is itself a U.S. military facility located on the banks of the Mississippi River near Rock Island.

35.     The PFAS levels detected at the Rock Island Arsenal CWS likely derive from the historical use of MilSpec AFFF at the Rock Island Arsenal. The U.S. Army prepared a Preliminary Assessment and Site Inspection of the Rock Island Arsenal pursuant to CERCLA (the federal Comprehensive Environmental Response, Compensation, and Liability Act) to investigate PFAS contamination at that facility, including contamination from PFOS and PFOA. A report containing the results of the preliminary assessment and site inspection was completed in February 2021.[22] The Army report identified multiple areas of potential interest ("AOPIs") where the use, storage, or disposal of PFAS-containing materials had occurred, and determined that elevated levels of PFOS and PFOA existed in the groundwater at many of those areas.[23] Those included AFFF storage warehouses and fire training areas.[24] The Army report explains that "AFFF-use and storage was identified at nine areas" of potential interest, including firefighting training areas and AFFF

---

[21] *See* Illinois EPA, *PFAS Statewide Investigation Network: Community Water Supply Sampling*, cited in note 1, *supra*.

[22] *See Draft Final V1A Preliminary Assessment and Site Inspection of Per- and Polyfluoroalkyl Substances, Rock Island Arsenal, Illinois*, prepared for the U.S. Army Corps of Engineers (Feb. 2021) (attached as Exhibit 2). The United States produced this document in the *In re AFFF* MDL.

[23] *Id*. at -1717 to -1720.

[24] *Id*. at -1717 to -1718; *see also id*. at -1733 to 1735 (identifying "Fire-Related Area[s]" were AFFF was used or stored).

storage areas where AFFF is currently stored.[25] The report also identified an additional site, an "Old Landfill," where burn pits "indicate[d] the use of AFFF during fire training exercises."[26] In addition, the report confirmed the use of AFFF during "two occurrences of the RIA Fire Department responding to offsite fires."[27] The Army report also describes historical evidence that "firefighting foam operations [were] conducted in the Mississippi River" and that the "foam [was] released into the Mississippi River during training exercises."[28] The report further explains that "[s]urface water runoff and/or groundwater associated with the AOPIs may discharge to the Mississippi River."[29] The report acknowledges that "PFAS impacts from other sources" may have contributed to PFAS contamination of the Mississippi River from the Rock Island Arsenal.[30] Because the Rock Island Arsenal is a U.S. military facility, any AFFF used, stored, or disposed at the Rock Island Arsenal would have been MilSpec AFFF. As a result, the elevated PFAS levels identified by the U.S. Army at and around the Rock Island Arsenal on the banks of the Mississippi River likely derive at least in part from the use, storage, and/or disposal of MilSpec AFFF at the Rock Island Arsenal.

36.     Because the State seeks to recover for PFAS levels at the seventy PFAS Sites identified through its investigation, and because Rock Island Arsenal CWS is one of those PFAS Sites, the State's claims to recover for PFAS contamination and for the costs of the State's

---

[25] *Id*. at -1736 to -1737.

[26] *Id*. at -1737.

[27] *Id*. at -1738.

[28] *Id*. at -1717; *see also, e.g.*, *id.* at -1743 (same).

[29] *Id*. at -1762; *see id.* at -1763 (same); *id*. at -1764 (same); *id*. at -1765 (same); *id*. at -1766 (same); *see also id.* at -1736 ("seeps located in the Mississippi River" are "downgradient" from training areas where AFFF was used).

[30] *Id*. at -1751.

investigation directly relate to PFAS contamination that plausibly derives from the historical use of MilSpec AFFF at Rock Island Arsenal.

37.     Many other PFAS Sites identified by the Illinois EPA (and thus the subject of the Complaint) are in close proximity to a military facility where "known" or "suspected" PFAS plausibly derived or could have derived from MilSpec AFFF use. At least two of the seventy PFAS Sites identified by the Illinois EPA are within one mile of a military facility where "known" or "suspected" PFAS levels plausibly derived from MilSpec AFFF use—the Moline CWS, which is within one mile of the Rock Island Arsenal, and the North Chicago CWS, which is within one mile of the Great Lakes Naval Station. Indeed, North Chicago has filed a lawsuit against 3M and other Defendants in the *In re AFFF* MDL for alleged PFAS contamination from AFFF.

38.     Because many of the seventy PFAS Sites referenced in the Complaint are in proximity to military facilities where PFAS releases plausibly resulted from historical AFFF use, it is reasonable to believe that PFAS levels at some of those seventy PFAS Sites referenced in the Complaint plausibly resulted at least in part from MilSpec AFFF use at such military facilities.

39.     Three of the other PFAS Sites identified by the State—the Rock Island CWS, Moline CWS, and East Moline CWS—are within ten miles of the Rock Island Arsenal (and indeed, the Moline CWS is within one mile of the Rock Island Arsenal). As a result, the PFAS levels at those three additional PFAS Sites for which the State seeks to recover damages plausibly derived at least in part from MilSpec AFFF use at the Rock Island Arsenal.

40.     In addition, the State seeks to recover for damages to the "Mississippi River System" that have resulted from PFAS. *See* Complaint at p. 83. Because the Rock Island Arsenal is located on the Mississippi River and MilSpec AFFF use at the Rock Island Arsenal plausibly contributed to the alleged PFAS contamination of the Mississippi River, the State's claims to

recover for damages to the "Mississippi River System" also plausibly derived at least in part from MilSpec AFFF at the Rock Island Arsenal among other locations.

41.    Moreover, there are a number of current or former military facilities in northeastern Illinois in the vicinity of Lake Michigan where PFAS releases are known or suspected to have occurred. Those military facilities include the Great Lakes Naval Station, Fort Sheridan, Naval Air Station Glenview, and the O'Hare Air Reserve Station.

42.    At least seven of the PFAS Sites identified by the Illinois EPA[31] and referenced in the Complaint (the Evanston CWS, Glencoe CWS, Lake Forest CWS, North Chicago CWS, Waukegan CWS, Wilmette CWS, and Winnetka CWS) are in close proximity to one or more of those military facilities in northeastern Illinois. One of them (North Chicago CWS) is within one mile of the Great Lakes Naval Station (and North Chicago has sued 3M in the *In re AFFF* MDL for alleged PFAS contamination from AFFF).

43.    Upon information and belief, because those seven PFAS Sites are in the vicinity of military facilities where there is "known" or "suspected" PFAS, the PFAS levels for which the State seeks to recover at those seven PFAS Sites plausibly derive at least in part from MilSpec AFFF use. Those seven PFAS Sites include four of the CWS's specifically identified in the Complaint—the Glencoe, Evanston, Wilmette, and Winnetka CWS's. *See* Complaint ¶¶ 254-281.

44.    Moreover, the Glencoe, Evanston, Wilmette, and Winnetka CWS's use surface water from Lake Michigan as their primary source of drinking water.

45.    PFAS have been detected in Lake Michigan.

---

[31] *See* Illinois EPA, *PFAS Statewide Investigation Network: Community Water Supply Sampling*, cited in note 1, *supra*.

46.     Upon information and belief, PFOS and PFOA also have been detected in the water supply for the Great Lakes Naval Station which is located near Lake Michigan.[32] In fact, many individual plaintiffs have filed suit against 3M and other Defendants in the *In re AFFF* MDL alleging personal injuries arising from use of AFFF at the Great Lakes Naval Station, including injuries from direct exposure to AFFF while serving as military firefighters.

47.     Upon information and belief, PFOS and PFOA levels at the Great Lakes Naval Station plausibly derived at least in part from the use of MilSpec AFFF at that facility. In fact, the PFAS Sampling Plan prepared by Naval Facilities Engineering Systems Command ("NAVFAC") for the Great Lakes Naval Station identifies numerous potential AFFF releases there.[33] Further, upon information and belief, PFOS and PFOA discharged from MilSpec AFFF use at the Great Lakes Naval Station plausibly migrated to, and contributed to PFAS in, Lake Michigan. NAVFAC's PFAS Sampling Plan itself indicates that one AFFF release "reached Pettibone Creek and the Inner Harbor area" (which is on Lake Michigan).[34] NAVFAC's PFAS Sampling Plan also explicitly says that certain areas where the Great Lakes Naval Station is located "drain east toward Lake Michigan."[35]

48.     Because the Glencoe, Evanston, Wilmette, and Winnetka CWS's source their drinking water from Lake Michigan, the PFAS levels identified by the State at those CWS's

---

[32] *See* Naval Station Great Lakes 2021 Consumer Confidence Report, https://cnrma.cnic.navy.mil/Portals/81/CNRMA/Documents/Environmental/CCR/2021%20consumer%20confidence%20 report%20-%20NSGL.pdf?ver=KyWKhw7bFINYjthr8FHEPg%3D%3D.

[33] NAVFAC, Final Sampling and Analysis Plan (Field Sampling Plan and Quality Assurance Project Plan) for Per- and Polyfluoroalkyl Substances Site Inspection, Naval Station Great Lakes, Great Lakes, Illinois, March 2021, at 33-35, *available at* https://administrative-records.navfac. navy.mil/Public_Documents/MID_ATLANTIC/GREAT_LAKES_NSTC/N00210_002191.pdf.

[34] *Id.* at 33.

[35] *Id.* at 29.

plausibly could have resulted at least in part from MilSpec AFFF releases at the Great Lakes Naval Station (and elsewhere) that reached Lake Michigan.

49.     Although the State alleges that "the People have further concluded that AFFF is not a source of PFAS contamination detected at" the seven CWS's specifically identified in the Complaint, including the Evanston CWS and Fox Lake CWS, Complaint ¶¶ 257, 307, the City of Evanston and Village of Fox Lake have themselves each filed lawsuits against 3M and other Defendants that are currently pending in the *In re AFFF* MDL. According to the complaint filed by the City of Evanston (which is in the vicinity of numerous current or former military facilities), "Plaintiff's [*i.e.*, the City of Evanston's] water supply has been contaminated by the use and discharge of Fluorochemical Products, *including AFFF*." Complaint ¶ 65, *City of Evanston v. 3M Co., et al.*, No. 2:22-cv-04304 (D.S.C.), ECF No. 1 (emphasis added). The complaint filed by the Village of Fox Lake (which is also in the vicinity of numerous current or former military facilities) similarly alleges that "Plaintiff's [*i.e.*, Fox Lake's] water supply has been contaminated by the use and discharge of Fluorochemical Products, *including AFFF*."  Complaint ¶ 65, *Village of Fox Lake, Illinois v. 3M Co., et al.*, No. 2:22-cv-04086 (D.S.C.), ECF No. 1 (emphasis added).

50.     In addition, the City of North Chicago—which is another PFAS Site identified by the Illinois EPA and is within one mile of the Great Lakes Naval Station—has also filed a lawsuit in the *In re AFFF* MDL against 3M and other Defendants to recover for PFAS contamination that purportedly has resulted from, among other sources, AFFF. *See* Complaint, *City of North Chicago v. 3M Co., et al.*, No. 2:22-cv-01500 (D.S.C.), ECF No. 1.

51.     The State is well aware that PFAS in the environment can derive from AFFF use at military facilities. The Illinois EPA's own *"PFAS"* website states, "Since the 1940s, PFAS have been used in a wide range of consumer products, industrial processes, and in some fire-fighting

foams (called aqueous film-forming foam or AFFF). This has resulted in PFAS being released into the air, water and soil."[36] The Illinois EPA's website further states, "These foams are used at airports, *military installations*, petroleum refineries and chemical manufacturing plants for fire and flammable vapor suppression as well as for training purposes" (emphasis added).[37]

52.     Further, the Illinois EPA itself has attributed in part the costs of its statewide PFAS investigation to use of AFFF in Illinois. In the press release announcing the investigation, the Illinois EPA identified "firefighting foam" as a source of the PFAS chemicals that it was investigating.[38] The Illinois EPA's press release provided a link to the Illinois EPA website (quoted in the prior paragraph) identifying "military installations" as a location where AFFF is used.[39]

53.     The costs of the State's statewide PFAS investigation into "finished water at 1,428 entry points to the distribution system representing 1,749 [CWS's] across Illinois" (Complaint ¶ 15) were incurred in part as a result of the use of MilSpec AFFF in Illinois and of the State's awareness that MilSpec AFFF may have contributed to PFAS contamination across Illinois.

54.     For all the reasons stated above, the alleged PFAS contamination and the costs of the State's PFAS investigation for which the State seeks recovery in this action are plausibly attributable in part to MilSpec AFFF use at military facilities in Illinois, and 3M is entitled to remove this case as a whole pursuant to federal officer jurisdiction.[40] That is because "[i]t is

---

[36] Illinois EPA, *Per- and Polyfluoroalkyl Substances (PFAS)*, cited in note 2, *supra*.

[37] *Id*.

[38] Press Release, Illinois.gov, *Illinois EPA to Begin Testing all Illinois Community Water Supplies for Per- and Polyfluoroalkyl Substances*, cited in note 3, *supra*.

[39] *Id*.

[40] PFAS in Illinois also plausibly derives from the use of MilSpec AFFF at large civilian airports, so-called "Part 139" airports. There are seventeen Part 139 airports in Illinois. *See* Part 139 Airport Certification Status List, *available at* Federal Aviation Administration, *Part 139 Airport Certification*, https://www.faa.gov/airports/airport_safety/part139_cert/?p1=carriers. Part 139 airports have historically used MilSpec AFFF, and beginning in 2006, the U.S. government has

entirely possible that Plaintiffs' injuries occurred from actions taken while Defendants were acting under color of federal office: namely, MilSpec AFFF," and because the State "cannot prevent Defendants from raising the production of MilSpec AFFF as a defense or alternative theory." *Nessel*, 2021 WL 744683, at *3. At a minimum, 3M is entitled to raise "the production of MilSpec AFFF as a defense or alternative theory" to the State's PFAS claims, and on that basis, 3M is entitled to remove this case as a whole to federal court. *Id*.

55.    The circumstances here are analogous to those in *Ridgewood Water v. 3M Company*—an action filed by a water utility alleging damages from PFAS contamination of its water supply. *See* Complaint, *Ridgewood Water v. 3M Co.*, No. 2:19-cv-09651, ECF No. 1-2 (D.N.J. April 11, 2019). That action was removed to federal court based on federal officer jurisdiction and then transferred to the *In re AFFF* MDL. The MDL Court denied the plaintiff's motion to remand. *See* Order, *In re AFFF*, No. 2:18-mn-2873, ECF No. 325 (D.S.C. Oct. 1, 2019). As the MDL Court acknowledged, the plaintiff in that case affirmatively disavowed any claim to recover for damages from contamination of its water supply due to MilSpec AFFF, but instead was purporting to bring suit to recover for PFAS contamination from other sources (including commercial or "non-MilSpec" AFFF). *Id*. at 2-3. But the removing defendants had shown that the contamination of the plaintiff's water supply was plausibly attributable in part to PFAS releases from the use of MilSpec AFFF at a nearby airport. The plaintiff disputed that evidence, *see id.* at 3, but the MDL Court concluded that federal officer removal was appropriate because the defendants "contend[ed] that the AFFF products were manufactured according to MilSpec" and

_____

required Part 139 airports to use AFFF meeting MilSpec standards. *See* FAA Part 139 CertAlert 06-02, Aqueous Film Forming Foam (AFFF) meeting MIL-F-24385 (Feb. 8, 2006). Many of the seventy PFAS Sites identified by the State are in the vicinity of Part 139 airports, including many of the seven CWS's specifically identified in the State's Complaint.

thus had a "colorable" federal defense, *id*. at 5. Federal officer removal is similarly appropriate here, despite the State's attempt to allege that "PFAS" excludes PFAS from AFFF, because the State's claimed damages from PFAS are plausibly due in part to MilSpec AFFF. *See Nessel*, 2021 WL 744683, at *3 ("The Court finds that Plaintiffs' artful pleading does not obviate the facts on the ground.").

### C.    All Four Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied

#### 1.    The "Person" Requirement Is Satisfied

56.    The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) is a "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'" *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *see Betzner*, 910 F.3d at 1015 ("Corporations are persons under § 1442(a).").

#### 2.    The "Acting Under" Requirement Is Satisfied

57.    The second requirement, "acting under" a federal officer, is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson*, 551 U.S. at 152; *see also Baker*, 962 F.3d at 942; *Ruppel*, 701 F.3d at 1181. "The words 'acting under' are to be interpreted broadly." *Isaacson*, 517 F.3d at 136. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813. Rather, "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer*, 860 F.3d at 255.

58.    The requirement is met here because the alleged PFAS contamination plausibly stems in part from MilSpec AFFF, a vital product provided by 3M that otherwise "the Government

would have had to produce itself." *Isaacson*, 517 F.3d at 137; *see also Ruppel*, 701 F.3d at 1181. MilSpec AFFF is a mission critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in [AFFF] formulations."[41] Accordingly, the military has long depended upon outside contractors like 3M to manufacture and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 ("[I]f a private contractor is performing a job that 'in the absence of a contract with a private firm, the Government itself would have had to perform,' the contractor is acting under a federal officer. . . . This is a product that the Government would have had to create if Defendants did not exist." (quoting *Watson*, 551 U.S. at 153-34)); *Ayo*, 2018 WL 4781145, at *8-9 (holding that 3M and other AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *In re AFFF*, 2019 WL 2807266, at *2 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military). If 3M and other manufacturers did not provide MilSpec AFFF for use by the military, the government would have to manufacture and provide the product itself.

59.    In designing, manufacturing, and supplying MilSpec AFFF products, 3M acted under the direction and control of one or more federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that

---

[41] *Fulfilling the Roosevelts' Vision* 37.

govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.[42] Further, the MilSpec AFFF products were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the United States Department of Defense.[43] Therefore, 3M has satisfied the "acting under" requirement. *See Nessel*, 2021 WL 744683, at \*3; *Ayo*, 2018 WL 4781145, at \*8-9.

### 3. The "Under Color Of Federal Office" Requirement Is Satisfied

60.    The third requirement, that a defendant's actions were taken "under color of federal authority," requires a connection between the charged conduct and asserted official authority. *See Baker*, 962 F.3d at 944-45; *Ruppel*, 701 F.3d at 1181. Like the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. To meet this requirement, "there need be only *a connection or association* between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (internal quotation marks omitted); *accord Baker*, 962 F.3d at 944 (Seventh Circuit has "join[ed] all the courts of appeals that have replaced causation with connection" for purpose of applying the "under color of federal office" requirement); *Isaacson*, 517 F.3d at 137-138 ("[d]efendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties.").[44]

61.    The State's claims against 3M for PFAS contamination of natural resources and for the costs of its PFAS investigation plausibly arise at least in part from 3M's production and sale of AFFF that was manufactured according to military specifications established by the Department

---

[42] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 9, *supra*.

[43] *See* Dep't of Defense, SD-6, at 1, cited at note 11, *supra*.

[44] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990, 2011 WL 5109532, at \*5 (S.D.N.Y. Oct. 21, 2011).

of Defense, and was then used, stored, or disposed of at U.S. military installations (and elsewhere) in Illinois where the use of MilSpec AFFF is required by the federal government. *See supra*, ¶¶ 28-55. As a result, the State's claims against 3M relate to acts taken under color of federal office. The liability that Plaintiffs are attempting to impose via state tort law due to the design choices related to the production of MilSpec AFFF would create a conflict in which 3M could not "comply with both its contractual obligations and the state-prescribed duty of care." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988); *see Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); *Nessel*, 2021 WL 744683, at *3 ("[I]t is entirely possible that Plaintiffs' injuries occurred from actions taken while Defendants were acting under color of federal office: namely, MilSpec AFFF."); *see also In re AFFF*, 2019 WL 2807266, at *2. "[I]t is enough for the present purposes of removal that at least some of the pollution arose from the federal acts." *Baker*, 962 F.3d at 945; *see also Ruppel*, 701 F.3d at 1182.

62.     In assessing whether the required connection exists, courts "credit Defendants' theory of the case." *Isaacson*, 517 F.3d at 137. As averred in this Notice of Removal, the State's alleged injuries plausibly arise at least in part from MilSpec AFFF. Accordingly, there is a sufficient connection between those claimed injuries and 3M's actions under color of federal office.

### 4.     The "Colorable Federal Defense" Requirement Is Satisfied

63.     The fourth requirement, a "colorable federal defense," is satisfied by 3M's assertion of the government contractor defense.

64.     At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original,

citation omitted). In other words, "a colorable federal defense under § 1442(a) need only be

plausible." *Betzner*, 910 F.3d at 1014. A defendant "need not win his case before he can have it

removed." *Willingham*, 395 U.S. at 407; *see Ruppel*, 701 F.3d at 1182 ("[T]his requirement . . .

encapsulates Congress's desire to have federal defenses litigated in federal forums. . . . Requiring

the defense only to be colorable, instead of 'clearly sustainable,' advances that goal." (quoting

*Willingham*, 395 U.S. at 407)); *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994) ("A federal

defendant need not show that he is entitled to *prevail* in order to have access to the federal forum.");

*see also Bennett*, 607 F.3d at 1089; *Isaacson*, 517 F.3d at 139. "[T]he defense need not be 'clearly

sustainable' to justify removal as merely 'colorable.'" *In re AFFF*, 2019 WL 2807266, at *3

(quoting *Acker*, 527 U.S. at 432); *accord Nessel*, 2021 WL 744683, at *4. At the removal stage,

the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required

to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional

issue." *Cuomo*, 771 F.3d at 116 (citing *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12

(2006)).[45] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable

to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010).

"Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's

defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal,

not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted); *see Ruppel*,

701 F.3d at 1182 ("At this point, we are concerned with who makes the ultimate determination,

---

[45] *See also Kraus v. Alcatel-Lucent*, Civil Action No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (citations omitted)).

not what that determination will be. . . . The validity of the defense will present complex issues, but the propriety of removal does not depend on the answers." (internal quotation marks omitted)).

65.     Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512; *see also, e.g.*, *Baker*, 962 F.3d at 946; *Betzner*, 910 F.3d at 1016.

66.     3M has alleged facts that satisfy these elements for purposes of removal. As discussed above, Naval Sea Systems Command approved reasonably precise specifications, governing MilSpec AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.[46] 3M's products appeared on the DOD Qualified Products List,[47] which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec.[48] *See Ayo*, 2018 WL 4781145, at *13 ("[T]here is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products."); *see also id.* ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); *In re AFFF*, 2019 WL 2807266, at *2 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

---

[46] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 9, *supra*.

[47] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014), and MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014), cited in note 17, *supra*.

[48] *See* DOD SD-6, *supra* note 11, at 1.

67.     Moreover, the government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contain PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or health issues.[49] For example, in October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire-fighting exercises are considered to have adverse effects environmentally."[50] In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil contamination" and the "potential" for "groundwater contamination."[51] By no later than 2001, DOD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."[52] In 2002, the U.S. Environmental Protection Agency ("EPA") issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to

---

[49] *See, e.g.*, EPA, Revised Draft Hazard Assessment of Perfluorooctanoic Acid and its Salts, at 1-6 (Nov. 4, 2002).

[50] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), http://www.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[51] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

[52] EPA Presentation on Activities/Issues on Fluorosurfactants, March 16, 2001 (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1971-2 (D.S.C.)).

alleged associations between PFOA and cancer.[53] More recently, in a November 2017 report to Congress, the Department of Defense acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[54] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants,"[55] and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[56] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); *In re AFFF*, 2019 WL 2807266, at *2 ("As to whether [Defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [Defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

68.     At a minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation and other specifications of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *Twinam v. Dow Chem. Co. (In re "Agent Orange" Prod. Liab. Litig.)*, 517 F.3d 76, 90 (2d

---

[53] *See* EPA, Revised Draft Hazard Assessment, *supra* note 49.

[54] Dep't of Defense, Aqueous Film Forming Foam Report to Congress 1-2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[55] MIL-PRF-24385F(4) § 3.2 (2020).

[56] MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020); *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

Cir. 2008); *see also Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1001 (7th Cir. 1996) ("*Boyle* does not require the contractor to warn the government of every possible danger—only those known to it and not the government."); *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990, 2011 WL 5109532, at *5 (S.D.N.Y. Oct. 21, 2011) ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89-90; *see also Oliver*, 96 F.3d at 1001-1002; *Ayo*, 2018 WL 4781145, at *13.

69.     3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries that plausibly were caused in whole or in part by 3M's compliance with military specifications, the State is attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

70.     The MDL court, based on an extensive record, has found that the government contractor defense asserted by 3M and other AFFF manufacturers presents genuine issues of fact for trial. *See In re AFFF Prods. Liab. Litig.*, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues is by definition better than merely "colorable."

71.     In short, under the liberal standard for federal officer removal, 3M has met its burden to remove the case—as the MDL Court and other courts in the PFAS litigation have held in denying  motions to remand—"by alleging that the Government provided specifications for MilSpec AFFF, that [its] AFFF conformed to those specifications, and that [it was] not aware of any dangers unknown to the Government. Whether these facts are true is not for this Court to

determine at this stage. The Court need only consider whether the defense is plausible; it is." *Nessel*, 2021 WL 744683, at *4.

## IN ADDITION, BECAUSE THE STATE'S CLAIMS AROSE IN PART ON A FEDERAL ENCLAVE, THIS COURT HAS JURISDICTION UNDER 28 U.S.C. § 1331 AND REMOVAL IS PROPER UNDER 28 U.S.C. § 1441(A)

72.    Removal of this action is also proper because Plaintiff's claims arose in part on a federal enclave.  To that extent, the claims are governed by federal law and are subject to this Court's original jurisdiction under 28 U.S.C. § 1331.  Thus, this action is removable under 28 U.S.C. § 1441(a). "A federal enclave is a portion of land over which the United States government exercises federal legislative jurisdiction." *Brookhaven Sci. Assocs., LLC v. Donaldson*, 2007 WL 2319141, at *5 (S.D.N.Y. Aug.9, 2007) (internal quotation marks omitted).

73.    The Constitution confers on Congress the power "[t]o exercise exclusive legislation" over the District of Columbia "and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings." U.S. Const. art. I, § 8, cl. 17. "It has long been settled that where lands for such a purpose are purchased by the United States with the consent of the State legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction." *Surplus Trading Co. v. Cook*, 281 U.S. 647, 652 (1930). Because the United States exercises sole lawmaking authority over a federal enclave, the law applicable to that enclave is by definition federal law, although such federal law may incorporate state-law rules of decision. *See, e.g.*, *Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952) ("[A]ny law existing in territory over which the United States has 'exclusive' sovereignty must derive its authority and force from the United States and is for that reason federal law"); *accord Macomber v. Bose*, 401 F.2d 545, 546

(9th Cir. 1968) ("State law theretofore applicable within the [ceded] area was assimilated as federal law, to remain in effect until changed by Congress. Rights arising under such assimilated law, arise under federal law and are properly the subject of federal jurisdiction."); *Brookhaven Sci. Assocs.*, 2007 WL 2319141, at *5 ("[W]hen an area becomes a federal enclave, the state law in effect at the time of cession becomes federal law and is the applicable law unless Congress provides otherwise.").

74.     Accordingly, it is settled that federal courts have federal-question jurisdiction under 28 U.S.C. § 1331 as to actions involving tort claims that arise on federal enclaves. *See, e.g.*, *Durham*, 445 F.3d at 1250; *Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998). It follows that such actions, if originally filed in state court, may be removed to federal court under 28 U.S.C. § 1441(a). *See, e.g.*, *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1236 (10th Cir. 2012); *Fuller v. Tenn. Valley Auth.*, 2007 WL 2077639 at *2 (E.D. Tenn. 2007).

75.     Some federal facilities in Illinois, including some of the federal facilities that are discussed above in this Notice of Removal (*see supra* ¶¶ 28-55), are or were federal enclaves at the time when AFFF and/or other PFAS or PFAS-containing products were released from such facilities.

76.     Because the State's claims for alleged PFAS contamination in Illinois arose in part from the use, storage, and/or disposal of AFFF and/or other PFAS or PFAS-containing products on one or more federal enclaves, this Court has original jurisdiction over the action, and removal of the action is proper under 28 U.S.C. § 1441(a).

* * * * *

WHEREFORE, 3M hereby removes this action from the State of Illinois Circuit Court of Cook County, to this Court.

Dated: March 3, 2023                    Respectfully submitted,

                                        */s/ Daniel L. Ring*
                                        Daniel L. Ring (IL Bar No. 6216750)
                                        MAYER BROWN LLP
                                        71 South Wacker Drive
                                        Chicago, IL 60606
                                        (312) 782-0600
                                        dring@mayerbrown.com

                                        *Counsel for Defendant 3M Company*

## CERTIFICATE OF SERVICE

I certify that on March 3, 2023, I caused true and correct copies of the foregoing Notice of

Removal, with its Exhibits, to be served on the following parties by first class mail and/or email,

as indicated below.

**By Email and First Class Mail**

Kwame Raoul
Matthew J. Dunn
Stephen J. Sylvester
Ellen F. O'Laughlin
Karen Howard
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
Environmental Bureau
69 West Washington Street, Suite 1800
Chicago, IL 60602
kwame.raoul@ilag.gov
matthew.dunn@ilag.gov
stephen.sylvester@ilag.gov
ellen.olaughlin@ilag.gov
karen.howard@ilag.gov

Adam J. Levitt
Daniel Rock Flynn
Amy E. Keller
Diandra Debrosse Zimmerman
Anna Claire Skinner
Special Assistant Attorneys General
DiCELLO LEVITT GUTZLER LLC
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
akeller@dicellolevitt.com
fu@dicellolevitt.com
askinner@dicellolevitt.com

Gregory M. Utter
Joseph M. Callow, Jr.
Special Assistant Attorneys General
Sarah V. Geiger
Collin L. Ryan
Matthew M. Allen

Joseph B. Womick
KEATING MUETHING & KLEKAMP PLL
1 East 4th Street, Suite 1400
Cincinnati, OH 45202
gmutter@kmklaw.com
jcallow@kmklaw.com
sgeiger@kmklaw.com
cryan@kmklaw.com
mallen@kmklaw.com
jwomick@kmklaw.com

Richard W. Fields
Martin Cunniff
Special Assistant Attorneys General
FIELDS, HAN & CUNNIFF LLC
1700 K. Street NW, Suite 810
Washington, DC 20006
fields@fhcfirm.com
martin.cunniff@fhcfirm.com

*Counsel for Plaintiff*

**By First Class Mail**

Arkema, Inc.
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

*Defendant*

AGC Chemicals Americas, Inc.
c/o CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604

*Defendant*

BASF Corporation
c/o CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604

*Defendant*

Bayer Corporation
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

*Defendant*

Clariant Corporation
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

*Defendant*

Daikin America, Inc.
c/o CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604

*Defendant*

E. I. du Pont de Nemours and Company
c/o CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604

*Defendant*

The Chemours Company
c/o CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604

*Defendant*

The Chemours Company FC, LLC
c/o CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604

*Defendant*

DowDuPont, Inc.
c/o CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604

*Defendant*

Corteva, Inc.
c/o CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604

*Defendant*

DuPont de Nemours, Inc.
c/o CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604

*Defendant*

Solvay Specialty Polymers, USA, LLC
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

*Defendant*

**Not Served**

Dyneon, L.L.C.
*Dissolved since 2011 and no longer exists;*
*no agent for service of process.*

*/s/ Daniel L. Ring*
Daniel L. Ring